**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

DIANA LAWHON, Individually and as
Administrator of the Estate of
CHRISTOPHER HINKLE, deceased,

   Plaintiff,


   v.

CITY OF PHILADELPHIA
1515 Arch Street – 14th Floor
Philadelphia, PA 19102,

   - and -

DEPUTY WARDEN JESSICA BOWERS
c/o Curran-Fromhold Correctional Facility
7901 State Road
Philadelphia, PA 19136,

   - and -

DEPUTY WARDEN ROBERT ROSE
c/o Curran-Fromhold Correctional Facility
7901 State Road
Philadelphia, PA 19136,

   - and -

WARDEN NANCY GIANNETTA
c/o Curran-Fromhold Correctional Facility
7901 State Road
Philadelphia, PA 19136,

   - and -

PRISON COMMISSIONER BLANCHE
CARNEY
c/o Curran-Fromhold Correctional Facility
7901 State Road
Philadelphia, PA 19136,

**Civil Action
No. 2:22-cv-04322**

|  |  |
|---|---|
| -   and   - | : |
|  | : |
| WARDEN JOHN DOES 1-10 | : |
| c/o Curran-Fromhold Correctional Facility | : |
| 7901 State Road | : |
| Philadelphia, PA 19136 | : |
|  | : |
| -   and   - | : |
|  | : |
| CORRECTIONAL OFFICER JOHN DOES 1-10 | : |
| c/o Curran-Fromhold Correctional Facility | : |
| 7901 State Road | : |
| Philadelphia, PA 19136 | : |
|  | : |
| -   and   - | : |
|  | : |
| CORIZON HEALTH, INC. | : |
| 8201 State Road | : |
| Philadelphia, PA 19136 | : |
|  | : |
| -   and   - | : |
|  | : |
| DONNA PUMMER LEONE, NP | : |
| c/o Corizon Health, Inc. | : |
| 8201 State Road | : |
| Philadelphia, PA 19136 | : |
|  | : |
| -   and   - | : |
|  | : |
| KIANA GREENE, RN | : |
| c/o Corizon Health, Inc. | : |
| 8201 State Road | : |
| Philadelphia, PA 19136 | : |
|  | : |
| -   and   - | : |
|  | : |
| MEDICAL JOHN DOES 1-10 | : |
| c/o Corizon Health, Inc. | : |
| 8201 State Road | : |
| Philadelphia, PA 19136 | : |
|  | : |
| Defendants. | : |

## **FIRST AMENDED COMPLAINT – CIVIL ACTION**

## **PRELIMINARY STATEMENT**

1.      In April of 2021, Curran-Fromhold Correctional Facility (hereinafter "CFCF") looked like a set in a horror movie. For years, corrections officers voiced concerns for understaffing, yet after repeated cries for help, from early 2020 leading to April 12, 2021, the jail continued to be more and more understaffed, while the occupancy of inmates continued to increase. The jail knew that their inadequate staffing would create rampant acts of violence by creating an atmosphere of lawlessness. Correctional officers would routinely not be able to properly man their posts, units were abandoned altogether at times, or would be so deficiently manned, that officers would fear for their lives and not be able to react to situations to protect inmates and inmates knew they could do what they wanted with impunity. In addition to alarming rates of violent assaults on inmates and officers, murders at the jail would skyrocket. Killings were particularly prevalent at Unit B, the jail's intake unit. There inmates would routinely be misclassified, and deaths would occur at these undermanned units. Additionally, these inmates were constantly locked down, not having any access for recreation time or to shower. Defendants knew that such prolonged lockdown periods had extreme effects on inmates' mental health and contributed to violent acts. Defendants knew that medical and mental health needs were not being met, further contributing to violence. The jail and Defendants knew that more deaths would occur due to their deliberate indifference.

2.      Christopher Hinkle was a non-violent, loving man with a drug problem. Unable to pay bail, he would be a pre-trial detainee at CFCF. On April 9, 2021, he was locked in a cell with Rameel Wright ("Inmate Wright"). Defendants knew that Inmate Wright ████████████████████████ ██████████████████████████████████████████████████████████████████ They also knew that Inmate Wright ██████████████ and involved in a heinous string of unprovoked and violent attacks on many civilians and officers in the days and months leading up to his incarceration, and that he suffered from delusional episodes. Defendants knew that Inmate Wright

would attack his cellmates and that he required to be placed in isolation alone ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

3.      Instead, Defendants placed Inmate Wright in a locked down cell with harmless, non-violent Christopher Hinkle. Christopher Hinkle required methadone treatment, but was provided none, so he was actively withdrawing in his cell with his violent, ██████████████, Inmate Wright. Christopher Hinkle was forced to lay in his own filth and pleaded with guards for a shower as he wasn't given one his entire stay. These factors would only add fuel to the fire burning in Inmate Wright to kill.

4.      On April 12, 2021, guards would notice aggressive behavior from Inmate Wright towards Mr. Hinkle and dangerous, erratic behavior from Inmate Wright, yet no action was taken. The unit was undermanned/unstaffed, with – at most – just one guard for the entire block.  Later that day, Inmate Wright would ██████████████████ and he would brutally beat Christopher Hinkle—who would tragically die from his injuries.

5.      Despite being a pre-trial detainee for a minor drug offense, the City of Philadelphia and Defendants knowingly issued Christopher Hinkle a death sentence.



(Christopher Hinkle is on the right, pictured with his brother and sister. Below, he is pictured with his nephew.)



6.    Plaintiff seeks justice from Defendants for violating Christopher Hinkle's civil rights and the atrocities done to him.

## JURISDICTION

7.      Plaintiff invokes jurisdiction pursuant to 28 U.S.C. § 1331 as the claims raise federal questions under 42 U.S.C. § 1983. Plaintiff further invokes supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for claims arising under state law as these claims form part of the same case and controversy as the claims brought under 42 U.S.C. § 1983.

## VENUE

8.      Venue is appropriately laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) as it is the judicial district in which the claims asserted herein arose.

## PARTIES

9.      Plaintiff, Diana Lawhon, Administrator of the Estate of Christopher Hinkle, is an adult individual and citizen of the Commonwealth of Pennsylvania. Diana Lawhon was appointed administrator of her son, Christopher Hinkle's Estate with the Monroe County Register of Wills.

10.      Defendant, City of Philadelphia, is a political subdivision and governmental or other jural entity organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania, with a principal place of business at 1515 Arch Street – 14th Floor, Philadelphia, PA 19102.

11.      At all times relevant hereto, Defendant City of Philadelphia, owned, operated, maintained, were responsible for, and/or otherwise controlled prison, jail, and correctional facilities including Curran-Fromhold Correctional Facility (hereinafter "CFCF") located at 7901 State Road, Philadelphia, PA 19136.

12.      Defendant, Deputy Warden Jessica Bowers (hereinafter "Deputy Warden Bowers") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

13.     At all times relevant hereto, Deputy Warden Bowers was a Deputy Warden for the CFCF, and, acting under the color of state law and in her authority as a Deputy Warden of the CFCF for the Philadelphia Prison System/ Philadelphia Department of Prisons. Deputy Warden Bowers is named individually and in her official capacity.

14.     At all times relevant hereto, Deputy Warden Bowers was responsible for ensuring the safety and security of inmates and of the premises of the CFCF, including, *inter alia*, staffing, operations, appropriate intake procedures, providing mental health care, classification, housing, security policies and procedures, and premises security and safety.

15.     Defendant, Deputy Warden Robert Rose (hereinafter "Deputy Warden Rose") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

16.     At all times relevant hereto, Deputy Warden Rose was a Deputy Warden for the CFCF, and, acting under the color of state law and in his authority as a Deputy Warden of the CFCF for the Philadelphia Prison System/ Philadelphia Department of Prisons. Deputy Warden Rose is named individually and in his official capacity.

17.     At all times relevant hereto, Deputy Warden Rose was responsible for ensuring the safety and security of inmates and of the premises of the CFCF, including, *inter alia*, staffing, operations, appropriate intake procedures, providing mental health care, classification, housing, security policies and procedures, and premises security and safety.

18.     Defendant, Warden Nancy Giannetta (hereinafter "Warden Giannetta") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

19.     At all times relevant hereto, Warden Giannetta was the Warden for the CFCF, and, acting under the color of state law and in her authority as the Warden of the CFCF for the Philadelphia Prison System/Philadelphia Department of Prisons. Warden Giannetta is named individually and in her official capacity.

20.     At all times relevant hereto, Warden Giannetta was responsible for ensuring the safety and security of inmates, and of the premises of the CFCF, including, *inter alia*, staffing, operations, appropriate intake procedures, providing mental health care, classification, housing, security policies and procedures, and premises security and safety.

21.     Defendant, Prison Commissioner Blanche Carney (hereinafter "Commissioner Carney") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

22.     At all times relevant hereto, Commissioner Carney was the Commissioner for the Philadelphia Prison System of the City of Philadelphia and acting under color of state law and in her authority as Philadelphia Prison Commissioner of the City of Philadelphia. Commissioner Carney is named individually and in her official capacity as commissioner of the Philadelphia Prison System/Philadelphia Department of Prisons. Additionally, Commissioner Carney was the final policymaker on correctional officer staffing levels for the Philadelphia Department of Prisons and other various aspects of prison operations, including providing medical and mental health care and classification and housing of inmates in the intake unit.

23.     Defendant Warden John Does 1-10, a fictitious designation, were warden(s) for the CFCF, and, acting under the color of state law and in their authority as the warden(s) of the CFCF for the Philadelphia Prison System/Philadelphia Department of Prisons. Plaintiff does not presently know the names of these defendants despite having conducted a reasonable search with due diligence

but will seek leave to amend the Complaint so as to name each appropriate defendant after additional discovery. These John Does were responsible for ensuring the safety and security of inmates, and of the premises of the CFCF, including, *inter alia*, staffing, operations, appropriate intake procedures, providing mental health care, classification, housing, security policies and procedures, and premises security and safety.

24.     At all times relevant to this Amended Complaint, Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, and Commissioner Carney were supervisors, agents, employees and policymakers for Defendant City of Philadelphia and assigned to work at CFCF.

25.     Defendant Correctional Officer John Does 1-10, a fictitious designation, were correctional officers and/or supervisors and agents, servants, and/or employees of Defendant City of Philadelphia assigned to work at CFCF and responsible for the conduct which gives rise to this action, namely the housing of Inmate Wright with Christopher Hinkle on April 9, 2021 through April 12, 2021 and failing to protect Christopher Hinkle. Plaintiff does not presently know the names of these defendants despite having conducted a reasonable search with due diligence but will seek leave to amend the Complaint so as to name each appropriate defendant after additional discovery. Among other things, it is believed these John Does were responsible for protecting Christopher Hinkle from Inmate Wright and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and dangerous propensities and isolate Inmate Wright. Among other things, these John Does were responsible for ensuring ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and they were responsible for isolating Inmate Wright from Christopher Hinkle.

26.     Defendant, Corizon Health, Inc. is a corporation or other jural entity organized and existing under and by virtue of the laws of the State of Delaware with a principal place of business at 8201 State Road, Philadelphia, PA 19136. The claim asserted against this Defendant is for negligence and/or professional negligence of its actual and/or ostensible agents, servants, and/or employees, and for its direct negligence as stated more fully herein.

27.     Defendant, Donna Pummer Leone, NP (hereinafter "Nurse Leone") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

28.     Defendant, Kiana Greene, RN (hereinafter "Nurse Greene") is an adult individual and citizen of the Commonwealth of Pennsylvania with a place of business at the above-captioned address.

29.     Defendant Medical John Does 1-10, a fictitious designation, were medical professionals and agents, servants, and/or employees of Defendant Corizon Health, Inc. assigned to provide medical services at CFCF and who were responsible for providing medical clearance information to correctional facility personnel for Inmate Wright during April 2021. Plaintiff does not presently know the names of these defendants despite having conducted a reasonable search with due diligence but will seek leave to amend the Complaint so as to name each appropriate defendant after additional discovery.

30.     At all times relevant to this Amended Complaint, Defendants Nurse Leone, Nurse Green, and Medical John Does 1-10 were medical professionals and agents, servants, and/or employees of Defendant Corizon Health, Inc. assigned to provide medical services at CFCF.

31.     At all times relevant hereto, Defendant Corizon Health, Inc. owned, operated, maintained, was responsible for, and/or otherwise controlled a medical unit located at the Detention Center, 8201 State Road, Philadelphia, PA 19136.

32.     At all times relevant hereto, Defendant Corizon Health, Inc. contracted with the Philadelphia Prison System to provide medical services to its inmates at the CFCF.

33.     At all times relevant hereto, Defendant Corizon Health, Inc. and its actual and/or ostensible agents, servants, and/or employees, including, but not limited to, Nurse Leone, Nurse Greene, and Medical John Does 1-10 had a duty to act reasonably and to exercise reasonable care in carrying out their duties as medical professionals.

34.     At all times relevant hereto, Defendant Corizon Health, Inc. and its actual and/or ostensible agents, servants, and/or employees, including, but not limited to, Nurse Leone, Nurse Greene, and Medical John Does 1-10 had a duty to ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████

35.     At all times relevant hereto, Defendant Corizon Health, Inc. acted or failed to act by and through its actual and/or ostensible agents, servants, and/or employees, including Nurse Leone, Nurse Greene, Medical John Does 1-10, and physicians, nurses, therapists, technicians, and/or medical practice personnel whose activities and conduct with regard to ████████████████ █████████████████████████████████████, and are presently known only to Defendants, but not to Plaintiff, after reasonable investigation and in the absence of complete discovery.

36.     At all times relevant hereto, Defendant Corizon Health, Inc. was liable for the negligent acts and/or omissions of its actual and/or ostensible agents, servants, and/or employees, including

Nurse Leone, Nurse Greene, Medical John Does 1-10, and physicians, nurses, therapists, technicians, and/or medical practice personnel whose activities and conduct with regard to the ███████████████████████████████████████████████████████ ██████████████████████ are presently known only to Defendants, but not to Plaintiff, after reasonable investigation and in the absence of complete discovery, under theories of agency, master-servant, *respondeat superior*, and/or control or right of control.

37.    At all times relevant hereto, Defendant Corizon Health, Inc. and its actual and/or ostensible agents, servants, and/or employees, as identified herein, were engaged in the practice of medicine and/or nursing, and were obligated to bring to bear in the practice of their respective professions the professional skill, knowledge, and care that they possessed, and to pursue their professions in accordance with reasonably safe and acceptable standards of medicine and nursing in general, and in their particular specialties. A certificate of merit for Corizon Health and the aforementioned Corizon Employee defendants has already been filed.

**BACKGROUND**

38.    The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

Systematic Failure

39.    At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of placing and/or housing violent offenders in cells with other inmates.

40.    At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of failing to provide medical and mental health care to violent inmates with serious mental illness.

41.    At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of ████████████████████████████████████████████████████.

42.     At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of ███████████████████████████████████.

43.     At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of failing to follow their written policies and procedures.

44.     At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of ███████████████████████████████████.

45.     At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of confining inmates to their cells for hours and days at a time, despite the known deleterious mental health effects it had on those inmates.

46.     At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of failing to █████████████████████████████████████████████

47.     At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of placing and/or housing violent offenders ███████████████████████████████.

48.     At all times relevant hereto, Defendant City of Philadelphia had a custom and practice of locking inmates in their cells for 24-hour periods or longer.

<u>Staff Shortages at CFCF and Dangerous Conditions</u>

49.     For years, the Philadelphia Department of Prisons has displayed a consistent and systemic failure to maintain proper staffing practices, resulting in a significant understaffing which has fostered an increase in inmate deaths and violence directly related to the lack of supervision.

50.     Commissioner Blanche, Deputy Wardens Bowers and Rose, Warden Giannetta, and Warden John Does 1-10, have long been aware of the dangers created by their failure to maintain proper staffing but deliberately failed to take proper action despite knowing inmates would suffer as a result.

51.     Commissioner Blanche, Deputy Wardens Bowers and Rose, Warden Giannetta, and Warden John Does 1-10 were acutely aware of the substantial risk of harm caused by their critically dangerous understaffing.

52.     Not only did the City of Philadelphia tolerate the escalating danger from their lack of staffing, Commissioner Carney went so far as to blame the issue of the general staffing shortages on the COVID-19 pandemic, despite there being evidence that this practice existed long before the pandemic.

53.     The custom of understaffing CFCF and the Philadelphia jails was longstanding and the custom of understaffing permitted cell blocks – such as the one in which Christopher Hinkle was house on – to be left unguarded or inadequately guarded, resulting in known increased risks of violence and slower responses to stop inmate violence.

54.     For example, as illustrated in *Powell v. City of Philadelphia*, understaffing has been a long-followed practice of the City of Philadelphia.  On November 4, 2004, then-Commissioner Leon King implemented a limited overtime policy for PDP officers, sparking significant understaffing. This understaffing led to an increase of violence in the jails and a deprivation of inmates' rights, as well as federal litigation to resolve the issue.

55.     According to the Philadelphia Office of the Controller, from 2019 to April of 2021 the PDP saw staff vacancies triple and conditions within the facilities become increasingly unsafe.[1]

56.     On June 29, 2021, City Controller Rebecca Rhynhart made a statement saying:

     The Department of Prisons is at a tipping point. Inadequate staffing levels have led to unsafe conditions for workers and confinement of inmates, many of whom are pre-trial, to

---

[1] https://controller.phila.gov/controller-rhynhart-calls-for-staffing-increase-at-philadelphia-prisons-department- to-improve-safety-for-correctional-officers-and-inmates/

their cells – sometimes for 20 or more hours a day... The City is responsible for the Department of Prisons' more than 1,500 correctional officers and approximately 4,600 inmates. We have a duty to provide safe working conditions and humane living conditions. The City must take an all-hands-on-deck approach to reach this hiring goal, with rigorous recruitment and multiple classes.

57.     Thereafter, on July 31, 2021, City Controller Rebecca Rhynhart, again, expressed serious concern with the lack of response, stating:

Just over a month ago, I shared serious concerns about conditions and staffing levels at Philadelphia Prison facilities and called on the Kenney Administration to hire at least 300 correctional officers this fiscal year. After personally seeing the conditions, I urged the Kenney administration to adopt an all-hands-on-deck approach to addressing the issues at Philadelphia Prisons to ensure the safety of both staff and inmates. This makes the recent news of two inmate deaths all the more heartbreaking. A month later, this is still not being addressed with the urgency required, and what's worse, the Kenney Administration has the audacity to say that staffing is adequate with only 23 additional hires. I cannot stand by and allow them to minimize the seriousness of this situation and continue putting the lives of inmates and staff at risk. The City must own this problem and do more to support our correctional officers and provide humane living conditions for our inmates. I am committed to pushing this issue until the Kenney Administration hires the staff needed to prevent more of these horrific incidents from happening.[2]

58.     This assessment was based on data provided by PDP which showed that from 2019 – 2021, correctional staffing declined by 440 officers and only 119 new officers were hired within the same period. At the time of the statement, Rhynhart indicated that more than 300 correctional officers were needed to meet adequate staffing.[3]

---

[2] https://controller.phila.gov/city-controller-rhynhart-releases-statement-on-deaths-at-philadelphia-prison-facilities/
[3] *Ibid.*

59.     The City of Philadelphia acknowledged the danger that the staffing shortages create, pointing to the five inmate-on-inmate homicides in PDP facilities from August 2020 – May 2021. A total that exceeded the prior eight years combined.[4]

60.     Further, Defendants were well aware prior to Mr. Hinkle's fateful attack that their deliberate failure to properly staff CFCF would create more violence.

61.     In fact, as reported by the Inquirer on January 20, 2021, "[S]taff and prisoners have attributed elevated tensions in the jails to short staffing and the mental health consequences of the strict lockdown."[5]

62.     Moreover, as of January 2021, Eric Hill, a spokesman for the union representing correctional officers "[l]aughed when asked if staffing was sufficient, and said there were 'very low number of staff who report to work each day.'" He said that and the shelter-in-place regimen had contributed to a climate of violence. "Ten minutes a day [out of cell], that's what primarily led to assaults on staff and other inmates."[6]

63.     In the January 20, 2021 Inquirer Article, Quadree Walker, an inmate at a Philadelphia correctional facility, reported:

>       "168 hours of smelling each other's gases and body odors!" Walker wrote, adding that his complaints to staff were met with indifference. He provided 48 other inmates' signatures backing his concerns.

>       "I am stressed out of my mind," he said. "I already tried to commit suicide twice. I can't take this too much longer. This is cruel and unusual punishment. It's starting to affect me physically and mentally."[7]

---

[4] *Ibid.*
[5] https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic-lockdowns-20210120.html
[6] *Ibid.*
[7] https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic-lockdowns-20210120.html

64.     Additionally, in March of 2021, at a city council meeting with Prison Administrators present, including Commissioner Carney, Sergeant David Robinson would note that staffing was low, not because of COVID-19, but because the City is not paying officers for their tour of duty. He would also note that the correctional facilities would recycle masks. He would decry that people are running from the job, that they are scared, and that the prison [correctional facility] administration has been wanting to keep the officers' concerns quiet for years.

65.     Sergeant Robinson noted that people don't come to work because they are working by themselves. There is no one there to watch each other's back. He would note that inmates are aggressive because of the staffing levels and being locked in their cells for hours at a time. He would note a norm for officers to be assaulted without repercussion.

66.     In regard to the nightmarish situation in Philadelphia Prisons, including CFCF, Sergeant Robinson would go on to state, "I blame the leadership, because they don't care and it shows."

67.     There was a hiring freeze and administrators were not staffing the correctional facilities appropriately per the collective bargaining agreement.

68.     Locks and call/alarm buttons for the correctional facilities' cells had not been addressed for years.

69.     Sergeant Robinson emphasized the correctional facilities are not safe. (And there currently is no proof offered that the alarm button inside Christopher Hinkle's cell was functioning and it is believed to not be working at the time of the subject attack.)

70.     Sergeant Robinson would continue to alert city council that morale is down and dangerously low. He constantly receives calls and texts from other officers that they are scared. He would note it is "our [the c/o's] blood, but their [administration's] budget".

71.     At the same hearing, Lieutenant Aquira Cheeks stated the staff feels they are not valued and they were begging for help.

72.     Correctional Officer Eric Hill would proclaim that the administration does not care about them.

73.     At this very meeting, correctional facility officials and staff admitted that a skeleton crew existed at CFCF, and that the 3-11 PM shift, during which Christopher Hinkle would eventually be brutally assaulted, is not properly staffed.

74.     With letters and concerns from inmates and officers, there was a running consensus expressed at the hearing: something needs to be done quickly and something should have been done quickly before.

75.     The *Philadelphia Inquirer* frequently reported on the failures of the PDP, including an April 23, 2021 article that stated there were shifts where as many as 14 of the 15 workers abandoned their shifts. [8]

76.     At a city council hearing in May of 2021, it was admitted that for the last three years the number enrolled in cadet classes has not met expectations.

77.     It was noted that at least two officers are required for each unit and that adequate staffing makes it safer for guards and inmates. (At the time of Christopher Hinkle's attack, there was – at most – only one guard present.)

78.     On May 19, 2021, it was reported that 64% of staff called out on Mother's Day weekend. [9]

79.     Commissioner Carney acknowledged that PDP was short 333 staff positions. [10]

---

[8] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html
[9] https://www.inquirer.com/news/philadelphia-department-prisons-lockdown-bail-fund-20210519.html
[10] https://www.inquirer.com/news/philadelphia-department-prisons-lockdown-bail-fund-20210519.html

80.     This number continued to grow, and in June of 2021 it was then reported that PDP was short 382 officers needed to operate safely.[11]

81.     By August 26, 2021 the gap had grown to 483 officers.

82.     In an August 26, 2021 report, the Pennsylvania Prison Society executive Director Claire Shubik-Richards stated "we have been warning the city for months that the prison [Philadelphia's correctional facility] is dangerous, unconstitutional in its conditions, and past the boiling point."[12]

83.     Correctional officers, including lieutenants, captains, and veterans of more than 20 years, told the *Inquirer* in October 2021 that the conditions in PDP facilities are the "worst they have ever seen."[13]

84.     It was then reported that the number of staff needed to operate safely had grown to 500.

85.     Highlighting the danger in the Philadelphia Prisons is the fact that the PDP inmate population remained about the same since 2019, yet over the same period had staffing levels dropped by 28%.

86.     On November 4, 2021, an analysis of PDP staffing rosters found that 20-30% of shifts on a given day were filled by officers and supervisors working overtime, and more than 40% of shifts listed were not filled at all.[14]

87.     Sergeant Robinson stated that "we're in a situation where we don't have staff. That makes the prisons [correctional facilities] dangerous... they had an obligation to keep these jails safe. And I'm going to be honest: I believe they failed."

88.     By the November report, the City Controllers claimed a 28% vacancy rate within PDP.

---

[11] https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html
[12] *Ibid.*
[13] https://www.inquirer.com/opinion/commentary/philadelphia-prisons-correctional-officer-shortage-20211006.html
[14] https://www.inquirer.com/news/philadelphia-jails-staffing-shortage-assault-20211104.html

89.     Commissioner Carney suggested then and since continued to suggest that the COVID-19 pandemic is to blame, however at the same time the Pennsylvania Department of Corrections reported only a 5.6% vacancy rate.

90.     In light of the critical understaffing of the PDP, measures such as contracting out these roles should have been undertaken.

91.     Insofar as the medical/mental health services have been contracted out, the City could have and should have taken the same approach, rather than hoping against hope that its futile approach of "recruiting" would garner more staff.

92.     In sum, Defendants' own employees put them on direct notice that their deliberate indifference would cause inmate deaths, including Christopher Hinkle's.

*Remick v. City of Philadelphia*

93.      In April of 2020, ten incarcerated individuals within various facilities operated by the Philadelphia Department of Prisons filed a civil rights class action lawsuit against the City of Philadelphia and Prison Commissioner Blanche Carney over the conditions of the prisons/correctional facilities and treatment of inmates by staff.

94.     Judge Schiller ordered the City and Prison Commissioner Blanche Carney through a partial settlement agreement dated June 3, 2020 to rectify certain failures including providing regular staff to maintain safe and optional operations for inmates.

95.     Consistent with the concerns involving the Staff Shortages, Jacquar J. Stokes, an inmate at CFCF submitted a Declaration stating:

> 21.     Recreation periods are extremely inconsistent. Whether we receive any recreation on a given day depends on how many officers show up to work. On weekends, none of the regular officers report to work. On pay weeks, it is more of the same.

96.   Daniel Marshall, an inmate at CFCF submitted a Declaration stating:

> 11.   For example, on August 19, 21, 22, 24, and 26, 2020 we received no time out of our cells. No explanations were provided, except on August 21. On that day, we were told that there would be no recreation because not enough guards were present at the facility.

97.   Naeem Beyah, an inmate at CFCF submitted a Declaration stating:

> 5.   Our out-of-cell time is still drastically cut short because there is a lack of staff. On Friday, November 27 and Saturday, November 28, 2020, for example, the unit received no out-of-cell time because not enough COs came to work. On Sunday, November 29, 2020, the unit received about 30 minutes of out-of-cell time.
>
> 6.   The staffing shortage similarly affects cleaning and sanitation.

98.   John Hart, an inmate at CFCF submitted a Declaration stating:

> 8.   It has become commonplace to go large stretches of time without seeing COs on our unit. This seems to be due to staff shortages. When there are no COs on the unit, nobody is allowed to come out of our cells.
>
> 15.   Some people on the unit are struggling to access mental health services. For example, my cellmate has been waiting to speak to mental health staff for weeks.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

> 8.   People are feeling very desperate and hopeless due to the lack of out-of-cell time, especially because we cannot predict when we are going to come out. We do not feel like we are being treated humanely.
>
> 9.   Staff tell us that the lack of out-of-cell time is due to staff shortages.
>
> 10.   There are often no officers on the block at all during the 3pm-11pm and 11pm-7am shifts.
>
> 11.   Staff shortages have also been affecting other necessary jail functions, including distribution of medication and mail.

99.     John Marks, an inmate at CFCF submitted a Declaration stating:

>    3.     We are still receiving only 20-30 minutes of out-of-cell time per day. Some days we are not allowed out of our cells at all. Staff members have told us that our lack of out-of-cell time is due to staff shortages.

100.    Sean Nicholas, an inmate at CFCF submitted a Declaration stating:

>    7.     The weekends are especially bad because, as staff tell us, there are frequent staff shortages.

101.    Kareem Sprual, an inmate at CFCF submitted a Declaration stating:

>    4.     Staff tell us that there are not enough correctional officers to have rovers on each unit, so we cannot come out for as long. Rovers are staff members who are not assigned to a particular unit, but move between units and provide supplies and additional assistance to the staff on the unit.
>
>    5.     Sometimes, staff shortages have resulted in us receiving no out-of-cell time at all. For example, on January 10, 2021 and on at least one occasion in February, no one came out of
>
>    their cells and the correctional officer on duty told us that this was because there were not enough staff members. Extended lack of out-of-cell time due to staff shortages is particularly common on the weekends.

102.    Breyon Hare, an inmate at CFCF submitted a Declaration stating:

>    10.    Correctional officers (COs) tell us that our lack of out-of-cell time is due to staff shortages.
>
>    11.    Staff shortages have been affecting other jail functions as well, including access to medical care.
>
>    12.    For example, on August 2, 2021, I was scheduled to see an outside provider due to a chronic eye condition. However, after waiting for over two hours, staff told me that there was no staff available to transport me to my appointment and that the appointment would have to be rescheduled. It took three months for PDP to schedule the appointment, so I am worried that it will be another long delay before it is possible to reschedule it. In the meantime, I am living with daily pain in my eye.

103.    Deputy Warden Edwin Cruz, in connection with the *Remick* Consent Order of June 3, 2020,

submitted a Certification dated February 25, 2021 stating:

> Due to the strenuous shortage of staff, Open Wards, and PHSW trip some areas did
> not receive time out of cell.
>
> The following units did not receive the two hours of recreation time during the
> week of 2-15-2021:
>
> On 2-15-2021: A-1-3, A-1-4, B-2-2, and C-1-1.
>
> On 2-16-2021: A-1-3, A-1-4, and D-2-3.
>
> On 2-17-2021: A-1-3, A-1-4, C-1-3, C-2-3, C-2-4, D-1-1, D-1-2, D-1-3, D-1-4, D-
> 2-1, D-2-2, D-2-3, and D-2-4.

104.    Deputy Warden Steven Angelucci, in connection with the *Remick* Consent Order of June

3, 2020, submitted a Certification dated March 4, 2021 stating:

> On 2-22-2021: A-2-3, A-2-4, B-1-2, B-1-3, B-1-4, B-2-1 thru 4, C-1-2, and D-1-1.
> These areas varied in recreation time but did not receive the complete 2 hours in
> accordance with the Federal Court Order due to: Strenuous staff shortage, Open
> Wards, Emergency medical trips and PHSW Trips.
>
> On 2-23-2021: A-1-2, A-1-3, A-2-1, B-1-2, B-1-4, B-2-3, C-1-3, C-2-1, D-1-3, D-
> 2-1, and D-2-3. These areas varied in recreation time but did not receive the
> complete 2 hours in accordance with the Federal Court Order due to: Strenuous
> s]aff shortages, Open Wards, Emergency medical trips and PHSW Trips.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

> On 2-24-2021: A-2-1, B-1-3, B-1-4, B-2-1, B-2-2, B-2-3, B-2-4, C-1-4, D-1-1, D-
> 1-2, D-1-3, D-2-1, D-2-2, and D-2-4. These areas varied in recreation time but did
> not complete 3 hours in accordance with the Federal Court Order due to: Strenuous
> staff shortages, Open wards, Emergency medical trips and PHSW trips.
>
> On 2-25-2021:  B-1-1, B-1-3, B-1-4, B-2-1, B-2-2, B-2-3, B-2-4, C-1-4, C-2-1, D-
> 1-3, D-1-4, D-2-2 and D-2-4. These areas varied in recreation time but did not
> complete 3 hours in accordance with the Federal Court Order due to: Strenuous
> staff shortages, Open wards, Emergency trips and PHSW trips
>
> On 2-26-2021:  A-2-1, A-2-2, A-2-3, A-2-4, B-1-1, B-1-2, B-1-3, B-1-4, B-2-1, B-
> 2-2, B-2-3, B-2-4, B-2-4, and D-2-4. These areas varied in recreation time but did
> not complete 3 hours in accordance with the Federal Court Order due to: Strenuous
> staff shortages, Open wards, Emergency medical trips and PHSW trips.

105.    Deputy Warden Edwin Cruz, in connection with the *Remick* Consent Order of June 3, 2020,

submitted a Certification dated March 11, 2021 stating:

> On 3-1-2021: A-1-3, A-1-4, B-1- 1,2,3,4, B-2-1,2,3,4, and C-1-2. C-1-3, C-1-4, D-1-1,2,3, and 4.
>
> These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.
>
> On 3-2-2021: A-1-3, A-1-4, A-2-2, A-2-3, A-2-4, All of B-1 and B-2, C-2-2, C-2-3, C-2-4, D-1-1,2, and 3, and D-2-1.
>
> These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

> On 3-3-2021: A-1-3, A-1-4, B-1-2, B-1-3, B-1-4, B-2-1, B-2-2, B-2-3, D-1-2, D-1-3, D-1-4, D-2-1, and D-2-4.  These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.
>
> On 3-4-2021:  All of A-1, A-2-2, A-2-4, C-1-2, C-2-4, D-1-2, and D-2-2.
>
> These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.
>
> On 3-5-2021: A-1-3, A-1-4, A-2-4, C-1-1, C-1-2, C-1-3, all of C-2, D-1-4, D-2-1, D-2-2.  These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.

106.    Deputy Warden Edwin Cruz, in connection with the Remick Consent Order of June 3,

2020, submitted a Certification dated March 18, 2021 stating:

> On 3-8-2021: A-1-3, A-1-4, B-2- 1, C-1-4. C-2-2, and D-2-4.
>
> These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.
>
> On 3-9-2021: A-1-1, 2, 3 and 4, A-2-1, 2, 3, 4, B-1-3, B-2-2, D-1-4, and D-2-2.
>
> These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.
>
> On 3-10-2021: A-1-2, A-1-3, A-1-4, A-2-1, A-2-2, B-2-1, B-2-2, B-2-3, B-2-4, All of C-1, D-1-1, and D-1-3.   These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.
>
> On 3-11-2021:  A-1-1, A-1-3, A-1-4, All of A-2, All of B-1 and B-2, C-1-1, C-2-1, C-2-4, D-1-1, D-1-2, D-1-3, D-1-4, and All of D-2.
>
> These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.
>
> On 3-12-2021: A-1-2, A-1-3, A-1-4, B-1-3, B-1-4, All of B-2. All of C-1 and C-2, and all of D-1 and D-2.  These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, Open Wards, Emergency medical trips and PHSW Trips.

107.    Deputy Warden Edwin Cruz, in connection with the *Remick* Consent Order of June 3, 2020,

submitted a Certification dated March 25, 2021 stating:

> On 3-15-2021: A-1-3, A-1-4, A-2-4, B-2- 1, C-1-1. C-1-3, C-1-4, and C-2-4,
>
> These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage: After review of the March 15, 2021 Emergency Staffing Reports, 7x3 shift reported out 16 Officers on FML, 1 AWOL, 6 Open Wards, 10 IOD, 5 Vacation, 3 LOA, 2 PHSW Trips, 5 Out Sick and 6 out 9 Officers Drafted left sick on their draft.
>
> After review of the Emergency Staffing Report, 3x11 Shift reported 17 FMLA, 3 AWOL, 1 IOD, 5 WOP, 5 LOA, 1 Funeral Leave, 2 Sick, 6 Open Wards, 5 Training, and 11 Officers Drafted with 7 leaving sick on their draft sick.

(CONTINUE TO NEXT PAGE)

On 3-16-2021: A-1-1, 2, 3 and 4, A-2-1, 2, 4, B-1-2, 3, B-2-2, B-2-4, All of C Building, and all of D Building.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage. After review of the March 16, 2021 Emergency Staffing Reports, 7x3 shift reported out 12 Officers on FML, 1 AWOL, 4 Open Wards, 6 IOD, 2 Off Site Trips, 3 WOP, 2 PHSW Trips, 8 Out Sick, 1 A/L, 10 Vacation, 8 Training, and 10 out 12 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 13 FMLA, 1 AWOL, 1 IOD, 1 LOA, 7 Sick, 7 Open Wards, 1 Z-Day, 5 Vacation, and 10 Officers Drafted with 4 leaving sick on their draft sick.


On 3-17-2021: A-1-2, A-1-4, A-2-1, A-2-2, A-2-3, A-2-4, All of B Building, and C-1-3.   These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, after review of the March 17, 2021 Emergency Staffing Reports, 7x3 shift reported out 13 Officers on FML, 2 AWOL, 6 Open Wards, 7 IOD, 10 Vacation, 3 LOA, 1 PHSW Trip, 3 Out Sick, 2 A/L, 1 Z-Day, and 7 out 10 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 18 FMLA, 6 AWOL, 2 IOD, 1 LOA, 5 Sick, 6 Open Wards, 4 Training, 7 Vacation, 1-ZDay, 2 Hospital Trips, and 11 Officers Drafted with 7 leaving sick on their draft sick.


On 3-18-2021:  A-1-4, A-2-2, A-2-4, B-1-2, B-1-3, B-2-1, B-2-2, B-2-3, B-2-4,  C-1-3, C-1-4, C-2-1, C-2-2, D-1-3, D-1-4, and D-2-3.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, after review of the March 18, 2021 Emergency Staffing Reports, 7x3 shift reported out 16 Officers on FML, 2 AWOL, 1 Open Wards, 8 IOD, 2 A/L, 6 Vacation, 2 Out Sick, 2 Z-Days, 2 WOP, 1 PHSW Trip, and 16 out 38 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 24 FMLA, 7 AWOL, 3 IOD, 6 Sick, 7 LOA, 3 Training, 9 Vacation, 1 Z-Day, 1 Funeral Leave, 3 Open Wards, and 15 Officers Drafted with 8 leaving sick on their draft sick.

On 3-19-2021: A-1-4, B-1-3, B-2-2, B-2-3, B-2-4, C-1-2, C-1-3, C-1-4, C-2-1, C-2-2, C-2-3, C-2-4, and D-1-4.  These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, after review of the March 19, 2021 Emergency Staffing Reports, 7x3 shift reported out 15 Officers on FML, 0 Open Wards, 7 IOD, 12 Vacation, 9 Out Sick, 2 WOP, 1 PHSW Trip, 2 Z-Days, 2 Funeral Leave, and 12 out 15 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 23 FMLA, 7 AWOL, 4 IOD, 8 Sick, 6 Open Wards, 7 LOA, 1 Z-Day, 5 Vacation, and 10 Officers Drafted with 7 leaving sick on their draft sick.

108.    Deputy Warden Edwin Cruz, in connection with the *Remick* Consent Order of June 3, 2020,

submitted a Certification dated April 1, 2021 stating:

On 3-22-2021: A-1-3, A-1-4, B-1-3, B-1-4, All of B-2,

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage: After review of the March 22, 2021 Emergency Staffing Reports, 7x3 shift reported out 11 Officers on FML, 2 AWOL, 4 Open Wards, 5 IOD, 9 Vacation, 4 LOA, 5 Out Sick, 1 Z-Day, 1 Funeral Lv., 1 E-Time, and 8 out 11 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 15 FMLA, 5 AWOL, 5 IOD, 3 LOA, 5 Sick, 2 Open Wards, and 12 Officers Drafted with 9 leaving sick on their draft sick.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

(CONTINUE TO NEXT PAGE)

On 3-23-2021: A-1-3, A-1-4, A-2-3, 2, B-1-2, 3, and 4,  B-2-3, and D-2-1.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage. After review of the March 23, 2021 Emergency Staffing Reports, 7x3 shift reported out 15 Officers on FML, 5 AWOL, 6 Open Wards, 4 IOD, 1 WOP, 3 Out Sick, 1 A/L, 7 Vacation, and 8 out 14 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 14 FMLA, 2 AWOL, 9 IOD, 4 LOA, 4 Sick, 6 Open Wards, 1 Z-Day, 1 E-Time, and 15 Officers Drafted with 14 leaving sick on their draft sick.


On 3-24-2021: A-1-3, A-1-4, C-1-3, C-2-1 and D-2-1.   These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, after review of the March 24, 2021 Emergency Staffing Reports, 7x3 shift reported out 12 Officers on FML, 2 AWOL, 5 Open Wards, 7 IOD, 9 Vacation, 6 Out Sick, 1 A/L, 1 E-Time, 4 WOP, and 11 out 12 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 14 FMLA, 6 AWOL, 3 IOD, 4 Sick, 6 Open Wards, 7 Vacation, 2 WOP, and 18 Officers Drafted with 15 leaving sick on their draft sick.


On 3-25-2021:  All of A Building, All of B Building, All of C Building, and all of D- Building.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, after review of the March 25, 2021 Emergency Staffing Reports, 7x3 shift reported out 10 Officers on FML, 10 Open Wards, 6 IOD, 2 A/L, 10 Vacation, 4 Out Sick, 1 E-Time, 3 LOA, and 11 out 15 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 16 FMLA, 4 AWOL, 5 IOD, 2 Sick, 9 Vacation, 3 WOP, 10 Open Wards, 1 Funeral Lv., 1 Training, 2 A/L, and 20 Officers Drafted with 14 leaving sick on their draft sick.

(CONTINUE TO NEXT PAGE)

On 3-26-2021: All of A, B, C and D Building.  These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Strenuous staff shortage, after review of the March 26, 2021 Emergency Staffing Reports, 7x3 shift reported out 12 Officers on FML, 11 Open Wards, 8 IOD, 12 Vacation, 6 Out Sick, 3 WOP, 10 Clinic Trips, 1 Z-Days, 3 Funeral Leave, 2 AWOL, 1 PHSW Trip and 6 out 8 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 26 FMLA, 6 AWOL, 5 IOD, 13 Sick, 10 Open Wards, 9 Vacation, 2 A/L, 6 WOP,  and 19 Officers Drafted with 11 leaving sick on their draft sick.

109.    Deputy Warden Edwin Cruz, in connection with the *Remick* Consent Order of June 3, 2020,

submitted a Certification dated April 15, 2021 stating:

On 4-5-2021: All of A Building, All of B-1, B-2-1, B-2-2, B-2-4, All of C Building, and D-1-1. D-1-2. D-1-3. D-2-1, D-2-2 and D-2-4.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Shortage of staff reporting: After review of the April 5, 2021 Emergency Staffing Reports, 7x3 shift reported out 18 Officers on FML, 4 Open Wards, 7 IOD, 11 Vacation, 8 Out Sick, 2 WOP, 2 Office Clinic Trips, 1 AWOL, and 8 out 15 Officers Drafted 14 left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 19 FMLA, 11 AWOL, 5 IOD, 6 LOA, 10 Sick, 9 Open Wards, 5 Vacation, 4 WOP, 1 Z-Day, and 19 Officers Drafted with 10 leaving sick on their draft sick.

(CONTINUE TO NEXT PAGE)

On 4-06-2021: A-1-1, A-1-2, A-1-3, A-1-4, A-2-1, A-2-2, A-2-3, 2, B-1-2, B-1-3, B-1-4, All of B2, All of C Building, D-1-1, and D-1-2.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Lack of reporting staff. After review of the April 6, 2021 Emergency Staffing Reports, 7x3 shift reported out 13 Officers on FML, 10 Open Wards, 5 IOD, 1 WOP, 8 Out Sick, 1 A/L, 4 Vacation, 4 Off Site Clinic Trips, 3 Training, 2 Funeral Leave, 2 DC Court, and 10 out 14 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 15 FMLA, 8 AWOL, 5 IOD, 2 Sick, 8 Open Wards, 1 Z-Day, 5 Vacation, 2 WOP, 1 Sick Advance, 1 A/L, and 15 Officers Drafted with 9 leaving sick on their draft sick.


On 4-7-2021: A-1-2, A-1-3, A-1-4, A-2-1, A-2-2, All of B Building, All of C Building, D-1-2, D-1-3, D-1-4, D-2-2, D-2-3 and D-2-4.   These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Shortage of reporting staff, after review of April 7, 2021 Emergency Staffing Reports, 7x3 shift reported out 13 Officers on FML, 2 AWOL, 4 Open Wards, 6 IOD, 7 Vacation, 9 Out Sick, 1 WOP, 2 Off Site Trips, 1 Training, 3 DC Courts, 2 Emergency Trips, and 11 out 14 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 16 FMLA, 6 AWOL, 7 IOD, 6 Sick, 8 Open Wards, 8 Vacation, 3 WOP, 1 Funeral Leave, 1 Z-Day,  and 14 Officers Drafted with 9 leaving sick on their draft sick.


On 4-8-2021:  A-1-3, A-1-4, A-2-4, B-1-2, B-1-3, B-1-4, All of B2, All of C Building, and all of D- Building.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Lack of staff reporting or calling out, after review of April 8, 2021 Emergency Staffing Reports, 7x3 shift reported out 10 Officers on FML, 9 Open Wards, 9 IOD, 7 Vacation, 7 Out Sick, 2 WOP, 3 AWOL, 1 Funeral Leave, 1 Emergency Trip, and 10 out 11 Officers Drafted left sick on their draft.

(CONTINUE TO NEXT PAGE)

After review of the Emergency Staffing Report, 3x11 Shift reported 13 FMLA, 4 AWOL, 7 IOD, 7 Sick, 4 Vacation, 5 WOP, 7 Open Wards, 2 Funeral Lv., 2 A/L, and 18 Officers Drafted with 10 leaving sick on their draft sick.

On 4-09-2021: A-1-3, A-1-4, All of A-2, All of B, C Building, and All of D Building.  These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Shortage of reporting staff after review of April 9, 2021 Emergency Staffing Reports, 7x3 shift reported out 16 Officers on FML, 7 Open Wards, 5 IOD, 9 Vacation, 8 Out Sick, 1 WOP, 2 Off Site Clinics, 1 Z-Days, 4 Funeral Leave, 2 AWOL, 1 A/L and 15 out 16 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 20 FMLA, 4 AWOL, 5 IOD, 5 Sick, 8 Open Wards, 10 Vacation, 2 A/L, 1 WOP, 1 Funeral Leave, 2 Sick Advance,  and 14 Officers Drafted with 10 leaving sick on their draft sick.

110.     Deputy Warden Edwin Cruz, in connection with the *Remick* Consent Order of June 3, 2020,

submitted a Certification dated April 22, 2021 stating:

On 4-12-2021: All of A Building, All of B Building, All of C Building, and All of D Building.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Shortage of staff reporting: After review of the April 12, 2021 Emergency Staffing Reports, 7x3 shift reported out 11 Officers on FML, 4 Open Wards, 7 IOD, 7 Vacation, 14 Out Sick, 2 A/L,  1 WOP, 1 AWOL, 4 Training, 1 Court, 2 Court Detail to DC, and 16 Officers Drafted 14 left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 20 FMLA, 6 AWOL, 5 IOD, 6 LOA, 2 Sick, 7 Open Wards, 8 Vacation, 5 WOP, 2 Z-Day, 4 Funeral Leave, 3 Sick Advance, 1 Jury Duty, 10 Emergency Trips, and 19 Officers Drafted with 9 leaving sick on their draft sick.

(CONTINUE TO NEXT PAGE)

On 4-13-2021: A-1-1, A-1-3, A-1-4, A-2-1, A-2-2, B-1-2, B-1-3, B-1-4, All of B2, All of C Building and All of D Builing.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Lack of reporting staff. After review of the April 13, 2021 Emergency Staffing Reports, 7x3 shift reported out 14 Officers on FML, 5 Open Wards, 7 IOD, 1 WOP, 12 Out Sick, 2 A/L, 10 Vacation, and 12 out 15 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 19 FMLA, 3 AWOL, 3 IOD, 15 Sick, 11 Open Wards, 1 Z-Day, 8 Vacation, 3 WOP, 2 A/L, 1 Funeral Leave, 1 Jury Duty, 10 Emergency Trips, 1 PHSW Trip, and 22 Officers Drafted with 13 leaving sick on their draft sick.


On 4-14-2021: All of A-1, A-2-1, A-2-3, A-2-4, All of B Building, All of C Building, and All of D Building.   These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Shortage of reporting staff, after review of April 14, 2021 Emergency Staffing Reports, 7x3 shift reported out 14 Officers on FML, 6 Open Wards, 7 IOD, 10 Vacation, 11 Out Sick, 2 WOP, 1 Funeral Leave, 3 Training, 1 PHSW Trip, 1 Official Visit, 4 Off Site Trips, 2 Emergency Trips, and 12 out 15 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 19 FMLA, 3 AWOL, 6 IOD, 11 Sick, 13 Open Wards, 6 Vacation, 2 WOP, 1 Funeral Leave, 1 Z-Day, and 2 A/L Days, 2 Training, 4 Emergency Trips, 1 PHSW Trip, 7 Officers on 7x3 shift, 10 Officers Drafted with 4 leaving sick on their draft sick.


On 4-15-2021:  A-1-3, A-1-4, A-2-2, A-2-3, A-2-4, All of B Building, and All of C Building.

These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Lack of staff reporting or calling out.  After review of April 15, 2021 Emergency Staffing Reports, 7x3 shift reported out 11 Officers on FML, 8 Open Wards, 5 IOD, 11 Vacation, 15 Out Sick, 1 WOP, 1 AWOL, 1 PHSW Trip, 1 Official Visit Hearing, 5 Off Site Clinic Trips,

(CONTINUE TO NEXT PAGE)

1 Emergency Trip, 3 DC Court Detail, and 6 out 8 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 19 FMLA, 5 AWOL, 3 IOD, 8 Sick, 7 Vacation, 17 Open Wards, 1 Funeral Lv., 3 LOA, 2 Z-Days, 3 Training, 1 Jury Duty, and 14 Officers Drafted with 8 leaving sick on their draft.


On 4-16-2021: All Building A, B, C, and D.  These areas varied in recreation time but did not receive the complete 3 hours in accordance with the Federal Court Order due to: Shortage of reporting staff. After review of April 16, 2021 Emergency Staffing Reports, 7x3 shift reported out 11 Officers on FML, 8 Open Wards, 8 IOD, 8 Vacation, 12 Out Sick, 1 WOP, 1 Off Site Clinics, 1 Funeral Leave, 2 AWOL, 1 A/L, 1 LOA, 1 Official Visit Hearing, 1 Emergency Trip, 3 DC Court Detail, and 11 out 15 Officers Drafted left sick on their draft.

After review of the Emergency Staffing Report, 3x11 Shift reported 22 FMLA, 7 AWOL, 3 IOD, 9 Sick, 9 Open Wards, 10 Vacation, 1 A/L, 4 WOP, 3 LOA, 1 Z-Day, 1 Jury Duty, 4 Emergency Trip, and 8 Officers Drafted with 4 leaving sick on their draft sick.

111.    Eli Rosa, an inmate at CFCF wrote a letter stating: "It has been over two weeks since I was able to use the phone and take a shower…I've done had seizures, fights and fell off my bunk, and no C/O [correctional officer] was around to help me get medical attention."

112.    There was no question that CFCF was extremely understaffed, yet defendants consciously chose to do nothing creating an atmosphere filled with carnage, violence and death.

113.    And the custom of understaffing was known to CFCF and prison officials through their own data, the Comptroller's investigation, the Remick litigation, and the massive uptick in violence at CFCF.  Defendants were well aware that they were depriving inmates of their constitutional rights, including Mr. Hinkle's.

Lack of Medical and Mental Health Care Intervention

114.    Not only was CFCF severely understaffed, medical intervention, including mental health care, of inmates was also known to be failing and dangerously inadequate.

115.    In turn, those with mental illness or medical conditions warranting care were disregarded and left to suffer.

*City of Philadelphia – Department of Prisons' Questions and Answers (6/2021)*

116.    June of 2021, the City of Philadelphia – Department of Prisons, in its Request for Proposals for the Provision of Prison Physical and Behavioral Health Care Services provided a question and answer to various issues/circumstances involving inmates and their care.

117.    When certain questions were posed, the following were the responses:

Question #92

Please provide the following information:

**The data below is from May 2019 - April 2021**

a. Number of attempted suicides in the past two (2) years: 49 serious suicide attempts (This number includes all serious self-injury attempts for which medical treatment was needed)

b. Number of deaths by suicide in the past two (2) years: 1 (one)

c. Number of episodes of suicide watch per month in the past two (2) years: 45.5/month, 1.5/day occurrences of suicide watch at PHSW (This number reflects all of the number of 1:1 suicide watches each day at the BH Inpatient Unit at PHSW from May 2019 - April 2021 divided by 24 to get the number per month and divided by 730 to get the number per day)

(CONTINUE TO NEXT PAGE)

d. Number of self-injurious events in the past two (2) years: 169 (this number represents all of the suicide attempt/self-harm flash reports received per our monthly PI report)

e. Number of psychiatric hospitalizations in the past two (2) years: 2,215

f. Number of psychiatric inpatient hospital days in the past two (2) years: 14,387 (this number was obtained by multiplying the average daily census for May 2019 - April 2021 by the number of days in the time frame (730))

g. Number of episodes of restraint per month in the past two (2) years: 0.2 (4 restraint occurrences in last 24 months)

h. Number of detainees in restrictive housing in the past two (2) years

Please see the posted Attachment "Longitudinal Data Grid".

i. Number of forced psychotropic medication events in the past two (2) years-No data.

j. Number of mental health grievances per month Questions: average of 1.1 (27 total grievances from May 2019 - April 2021)

118.     As demonstrated by the responses, the City of Philadelphia (and Defendants) during a roughly two (2) year span was on notice of the numerous "serious" suicide attempts as well as self-injurious events evidencing the failings of the City, CFCF, its personnel, and the medical/mental health staff in the prevention of these ever constant occurrences.

119.     The pervasive and permanent nature of these customs – taking place in this two-year window – demonstrate that the City, CFCF, its personnel, and the medical/mental health staff had a custom in place to willfully and deliberately ignore the mental health needs of inmates within the jail.

*Complaints at CFCF by Inmates 1.11.2021 to 3.30.2021*

120.     The Prison Society received a list of complaints from inmates, which contains – in relevant part – those made from January 11, 2021 to March 30, 2021.

121.     Though not a full scope of the complaints received, these were complaints made by telephone, giving echoing the growing and concerning conditions that were constantly present at CFCF with respect to medical and mental health treatment or lack thereof:

| Platform | Institution | Classification | Classification 2 | Comments | Date |
|---|---|---|---|---|---|
| Phone | Philadelphia: CFCF | Welfare Check | Mental Health | Has mental health issues, concerend he is not being given his medication. | 1/11/2021 |
| Phone | Philadelphia: CFCF | Healthcare | RHU | He was stabbed and needs a slip to go to the eye doctor | 2/18/2021 |
| Phone | Philadelphia: CFCF | Healthcare | Mental Health | Is not getting the right medication, needs a mental health evaluation | 3/18/2021 |
| Phone | Philadelphia: CFCF | Mental Health | Healthcare | going blind and suffers mental disorder; no medical or mental support in facility | 3/30/2021 |

### *Rashaan Chambers*

125.  In April of 2021, Rashaan Chambers was an inmate at CFCF.

126.  On April 6, 2021, Mr. Chambers attempted to get medical care for his diabetes but was reportedly denied.

127.  According to his mother, Mr. Chambers reported that no guards checked on him during the night nor did they complete morning checks.

128.  Feeling ill, Mr. Chambers did not go out of his cell for recreation time on April 7, 2021 but this did not alert staff to check on him. Staff reportedly did not seek care or check on Mr. Chambers until his family complained.

129.  Mr. Chambers was eventually taken to the hospital.

130.  On April 16, 2021 at 8:42 a.m., Mr. Chambers was pronounced dead from complication of diabetic ketoacidosis.

131.  Despite there being a clear need for assistance, Mr. Chambers was ignored until his condition was too severe to survive.

### *Quincy Day-Harris*

132.  Quincy Day-Harris, a 25-year old inmate at the Philadelphia Department of Prisons' Detention Center was found dead by suicide on August 25, 2021.

133.   Mr. Day-Harris' family stated that he suffered from paranoid schizophrenia, which was well known and well-documented at the jail by virtue of Mr. Day-Harris' prior incarcerations.

134.   In fact, Mr. Day-Harris had been admitted to a hospital for his psychiatric needs.

135.   Mr. Day-Harris' family believes the jail did not provide the needed and necessary oversight if Mr. Day-Harris in light of his documented mental health issues needing to be addressed.

*Unknown Inmate #1*

136.   Norman Cooper, an inmate at CFCF, reported that in 2020, an unknown inmate on his cell block committed suicide.

137.   It is alleged that due to insufficient staffing leading to guards not checking on cells, the unknown inmate was left hanging for several hours.

138.   According to Mr. Cooper, the cellmate of the unknown inmate was banging on their cell for hours trying to summon help. The calls went unanswered.

Deaths – Inmate-on-Inmate Violence and other Assaults

139.   The results of the conditions, lack of staffing, and protocols and deliberate indifference of Defendants at CFCF have resulted in unnecessary violence and deaths.

140.   The City of Philadelphia acknowledged the danger that the staffing shortages create, pointing to the five inmate-on-inmate homicides in PDP facilities from August 2020 to May 2021. A total that exceeded the prior eight years combined.[15]

141.   As reported by the Inquirer, "prison data found assaults on staff were up 44% for the first six months of lockdown compared with the average number of incidents reported over the same period for the five previous years."[16]

---

[15] https://controller.phila.gov/controller-rhynhart-calls-for-staffing-increase-at-philadelphia-prisons-department- to-improve-safety-for-correctional-officers-and-inmates/
[16] https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic-lockdowns-20210120.html

142.    As of January 2021, before additional deaths that would occur in the months after, the homicide rate in Philadelphia jails was 15 times higher than the national average of four per 100,000 jail inmates, per the most recent data reported by the Bureau of Justice Statistics.[17]

143.    Further, in February of 2021, a Correction Officer was stabbed.

### *Richard Hightower*

144.    On September 15, 2019, Richard Hightower, an inmate at CFCF was housed with Anthony Tyler, his cellmate.

145.    Anthony Tyler had a history of violent crimes and serious mental illness.

146.    Anthony Tyler grabbed Mr. Hightower, who was asleep on the top bunk, and forcefully drove him into the cement floor and proceeded to brutally punch and kick Mr. Hightower about the face, upper body, and chest. This is a quintessential example of a consistent pattern of knowingly and improperly misclassifying inmates and failing to protect inmates from violent and ███████████████████████████████████████████.

### *Frankie Diaz, Jr.*

147.    In August 2020, Frankie Diaz, Jr., an inmate at a Philadelphia jail, was beaten by a fellow inmate that left him brain dead.[18]

148.    On August 19, 2020, Mr. Diaz succumbed to his injuries and died.[19]

### *Naim Jones*

149.    In October 2020, Naim Jones, an inmate, was fatally beaten by a cellmate at a Philadelphia Jail.

---

[17] *Ibid.*
[18] https://www.nbcphiladelphia.com/investigators/inmates-murdered-inside-philly-jails-amid-staff-shortages/2812072/
[19] *Ibid.*

### *Dale Curbeam*

150.    On January 15, 2021, Dale Curbeam was found face down, unconscious, and bleeding in his cell at CFCF.

151.    Mr. Curbeam was pronounced dead just a few minutes after being discovered. The cause of death was ruled a homicide by blunt impact head trauma. Mr. Curbeam's cellmate was arrested in connection with the murder.

152.    Mr. Curbeam was at CFCF for less than a week before he was murdered by his cellmate.

153.    According to a person with knowledge of the situation – only one staff person was assigned to unit that Mr. Curbeam was attacked on. As such, said unit was woefully understaffed. Further, this is the very unit where Christopher Hinkle would be attacked and this murder is another instance of another willful security lapse for housing Mr. Hinkle with a violent cellmate.

### *Armani Faison*

154.    In late March of 2021, Armani Faison was arrested for shoplifting charges and sent to Curran-Fromhold Correctional Facility.

155.    Mr. Faison was assigned to a cell with Kevin Massey who two days before had attempted to rape his cellmate.

156.    On March 27, 2021, Massey raped again. Massey repeatedly raped Mr. Faison for hours as his screams for help and those of inmates housed nearby went unanswered. The rape only subsided when Massey murdered Mr. Faison. Mr. Faison's body was found the following morning naked, bloodied, and floating in six inches of water.

157.    At the time of the attack on Mr. Faison, there were no staff on the Unit. Again, this Unit was woefully understaffed and this is the very unit where Mr. Curbean was previously murdered and where Mr. Hinkle would be murdered soon after.

158.    This was another willful lapse on the part of Defendants to place Massey in a cell with Mr. Faison.

<u>*Unknown Inmate #2*</u>

159.    On September 30, 2021, an unknown inmate at CFCF was repeatedly beaten and stabbed by three other inmates.

160.    There were no guards on the cell block.

161.    The unknown inmate, with no help available, staggered back to his cell as other inmates mopped up the blood.

<u>*Statement from Jonathan Migge*</u>

162.    Jonathan Migge, an inmate at CFCF stated – in his Declaration in the *Remick* case that:

> 8.      I have not been able to clean my cell since I have been back at CFCF, which has been more than a week.
>
> 9.      Before I was moved back to my current cell, two other people had gotten into a fight in that cell. As a result of the fight, there is dried blood on the door. I have asked for bleach to clean it off and disinfect the cell, but staff told me they do not have any.

<u>*Declaration of Christian Maldonado*</u>

163.    Christian Maldonado, an inmate at CFCF stated – in his Declaration in the *Remick* case that:

(STARTS ON NEXT PAGE)

41

2.     I have been incarcerated at CFCF for about two years. I am currently housed on D2P3. I've been on this block for about nine months. Before that I was on A1P4 (the hole), and prior to that I was on C1P1.

3.     Since the pandemic began, there have been a lot of assaults, both between incarcerated people and by staff.

4.     In one instance, in February 2021, an incarcerated person assaulted me and knocked out my two front teeth. Afterwards, the COs put me back in the cell with the same person who assaulted me. They took me to the hospital 4-5 hours later. My teeth had to be surgically reattached and my lip had to be stitched up. I have yet to see a dentist after this assault.

5.     I have been assaulted by other incarcerated people twice. The guards did not come right away for those incidents. They always remain in the bubble, even when the block is open.

6.     This is because there are not enough correctional officers (COs). This has been the case ever since the pandemic started. During some shifts, there are only three COs for four blocks on one pod; there are supposed to be at least seven. Meanwhile on weekends, there are maybe two COs total.

### Philadelphia Prisons – Policies and Procedures

164.    The Policies and Procedures of PDP are clearly set forth in the Handbook – yet, as has become commonplace, they are entirely disregarded—due to, among other things, Defendants' deliberate indifference and failure to train.

165.    Whether it be at Intake, Admissions and Diagnostics, Classification, or Mental Health Intervention, Defendants have willfully, intentionally, and knowingly failed to adhere to their own policies and procedures, with inmates becoming the sufferers of those failures.

### *Intake*

166.    During the first four (4) to seventy-two (72) hours of an inmate's incarceration, the inmate is to have:

a.    Administration of the intake health screens;

    b.  Electronic verification of prescription histories;

    c.  Physical and behavioral health screening;

    d.  Establishment of a medical record; and

    e.  Scheduling and provision of referrals and treatments, if necessary.

167.    Further, inmates who refuse the Intake Health Screening are to be kept in isolation on an Intake unit. Any inmate placed in Medical Isolation will be seen daily by a Qualified Health Care Provider and weekly by a Qualified Behavioral Health Care Provider and these visits are to be documented in the I.

168.    Qualified health care staff shall conduct screenings that determine – in part:

    a.  Behavioral Health; and

    b.  Behavioral Health History.

169.    Of importance, certain intake screening instruments – e.g. Serious Mental Illness, that are answered with a "Yes" will prompt appropriate referrals to be made immediately.

170.    The Receiving Room Sergeant is to be notified when behavioral health care staff recommend special treatment and/or housing.

171.    This then prompts referral to behavioral health for determination of treatment and housing.

### *Admissions and Diagnostics*

172.    If an inmate refuses to be examined and/or tested, said inmate will be isolated in a single cell until such time said inmate submits to an examination and testing.

173.    Health care staff may prescribe single cells for inmates who they deem to have a need for a particular housing type for psychological reasons.

174.    Staff will ensure that all inmates who require stringent security for behavioral reasons are housed separately in designated areas in the quarantine unit. When single cells are unavailable and

an inmate arrives who requires a single cell, the Admission and Diagnostics Manager will review Admission and Diagnostics housing assignments to ascertain which inmate can be moved into another cell to provide a single cell for the inmate with greater need for one.

<em>Med Lock</em>

175.    Where an inmate is placed on "med lock", he shall be isolated and not share a cell with any other inmate. One particular reason for this directive is that these inmates on med lock are deemed a threat to the health and safety of themselves and others.

<em>Behavioral Health Evaluations</em>

176.    When an Emergency Referral for a behavioral health evaluation is prompted, the evaluation is to be performed by the behavioral health provider within four (4) hours of said prompt.

177.    When an Urgent Referral for a behavioral health evaluation is prompted, the evaluation is to be performed by the behavioral health provider within twenty-four (24) hours of said prompt.

178.    The initial behavioral health examination/assessment includes an assessment of the inmate's specific physical, psychological, developmental, familial, educational, vocational, social, and environmental needs in order to determine the adequacy of the inmate's logic, judgment, insight, and self-control to responsibly meet said inmate's needs.

179.    Emergency Referrals are prompted for voluntary or involuntary evaluation and determination of need for hospitalization and/or other treatment.

180.    Urgent Referrals are prompted for illness not rising to the standard of an Emergency Referral.

181.    When performing the behavioral health evaluation as prompted by an Emergency Referral or Urgent Referral, the evaluation consists of – in relevant part:

    a.    Inmate identifying information;

    b.   Referral source;

    c.   Presenting problem;

    d.   Medical, social, and developmental history;

    e.   Diagnosis and evaluation;

    f.   Treatment plan;

    g.   Treatment progress notes for each inmate contact;

    h.   Medication orders;

    i.   Discharge summary; and

    j.   Referral to other agencies when indicated.

<u>*Post Policy and Collective Bargaining Agreement*</u>

182.    The City had its own post policies, which detail the required number of guards to be on each cell black.

183.    Specifically, the post policies state that two (2) guards are required to be present on each cell block, at all times, for inmate and staff safety.[20]

184.    In addition to its requirements as detailed in the Post Policy, the City of Philadelphia also has its collective bargaining agreement, which succinctly mentions that two guards are to be on each cell block at all times for both inmate and staff safety.[21]

185.    In 1996 a labor dispute resulted in a requirement that there be one correctional officer for every sixty-four (64) inmates in a housing unit. Upon the admission of the 65th inmate, a second correctional officer is required.

186.    

    ■

---

[20] *See Allrich Jean v. The City of Philadelphia; et al.*, Civil Action No. 2:22-cv-00433, Document 25-1 at ¶ 32.
[21] *Id.*

187. █████████████████████████████████████████████████████████

████████████████████████████████████

188. █████████████████████████████████████████████████████████

██████████

### Unstaffing/Understaffing of Unit B1, Pod 3 on April 12, 2021

189.    Upon information and belief, Unit B1, Pod 3, at most had one correctional officer who was

floating between Pod 3 and Pod 2, on the evening of April 12, 2021.

190. █████████████████████████████████████████████████████████

███████████████████.

191. █████████████████████████████████████████████████████████

██████████████████████████████████.

192. █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████

193.    In an article published by the *Philadelphia Inquirer* on March 30, 2021, former CFCF

Warden John Delaney stated that said leaving the unit unattended violates most basic security

protocols:

> At no time should a housing area in any facility within the Philadelphia Department of
> Prisons be left unmanned for any extended period of time….This not only compromises
> the health and welfare of the inmates assigned to that area, but it also jeopardizes the safety
> and security of the facility and places staff in unnecessary risk.[22]

194. █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[22] https://www.inquirer.com/news/philadelphia-prisons-jail-armani-faison-homicide--20210330.html

<u>Prior Charges of Inmate Wright Displaying a Consistent Pattern of Violent and Erratic Behavior</u>

195.     Inmate Wright was no stranger to the criminal justice system.

196.     On August 6, 2018, Inmate Wright entered a CVS that he was known to steal from before. When an employee asked him to leave and place the frozen dinner and juice drink he took possession of, Inmate Wright stated, "I'm not giving you anything back because I'm in the Illuminati and it's free for me." Inmate Wright then proceeded to shove an employee out of his path. He was arrested on the same day and charged with (1) Harassment; (2) Defiant Trespass; and (3) Retail Theft.

197.     On October 19, 2018, Inmate Wright was arrested and charged with (1) Harassment – Subjecting Other Person to Physical Contact; (2) Criminal Trespass / Simple Trespasser; (3) Disorderly Conduct Obscene Language / Gestures; and (4) Blocking Access. On December 5, 2018, under docket number MC-51-SU-0009564-2018, Inmate Wright pled guilty pursuant to Rule 1002. Said sentence and penalty are unknown to Plaintiff at this time. Specifically, Inmate Wright was panhandling and informed by an officer that he could not do so, as he was blocking access to SEPTA passengers. Inmate Wright threatened to punch the officer in the face.

198.     On February 13, 2021, Inmate Wright was arrested and charged with (1) Simple Assault; (2) Recklessly Endangering Another Person Physical Contact; and (3) Disorderly Conduct – Engaging in Fighting. Said case is presently pending in the Philadelphia County – Municipal Court – Criminal Division – MC-51-CR-0003030-2021. In the criminal complaint it was noted that Inmate Wright was homeless. Inmate Wright attacked a random female civilian without any provocation, slapping her across the face.

199.     On February 22, 2021, Inmate Wright randomly assaulted a male passenger on an eastbound train. Unprovoked, Inmate Wright randomly grabbed both handrails and kicked this

man repeatedly in the face and body. The victim did not know Inmate Wright and prior to the attack recalls Inmate Wright "screaming a bunch of crazy stuff."

200.    On February 22, 2021, Inmate Wright headbutted a SEPTA Police Officer, while in custody, causing him to sustain a bloody nose. Inmate Wright was arrested and charged with (1) Aggravated Assault; (2) Simple Assault; (3) Recklessly Endangering Another Person; and (4) Resisting Arrest. Inmate Wright was arrested in connection with these acts on April 1, 2021.

201.    On March 26, 2021, Inmate Wright committed the offenses to wit: (1) Terroristic Threats with Intent to Terrorize Another; and (2) Harassment – Subjecting Other Person to Physical Contact. Inmate Wright was not arrested and charged with said crimes until April 29, 2021. Said case is presently pending in the Philadelphia County – Municipal Court – Criminal Division – MC-51-CR-0008058-2021. Specifically, per the criminal complaint, a sanitation worker for SEPTA was cleaning the floor at the Walnut-Locust station when Inmate Wright "threatened to cut him." Inmate Wright was observed to be reaching towards his waistband and lunging at the SEPTA employee.

202.    On April 1, 2021, Inmate Wright was arrested and charged with (1) Aggravated Assault – Attempting to cause Serious Bodily Injury or Causing Injury with Extreme Indifference; (2) Possessing an Instrument of Crime with Criminal Intent; (3) Simple Assault; and (4) Recklessly Endangering Another Person. Said case is presently pending in the Philadelphia County – Court of Common Pleas – Criminal Division – CP-51-CR-0000519-2022. As detailed in the criminal complaint, Inmate Wright struck a man several times in the face with a pipe causing serious injury, including broken teeth and abrasions, which required medical treatment. This is believed to be another random, unprovoked attack prompted by ██████████████████████████████.

203. 

## Intake and Admissions of Inmate Wright and Christopher Hinkle

204.

205.

206.

207.

208.

209.

210.

211. 

212.

213.

214.

215.

216.

217.

218.   On April 6, 2021, Christopher Hinkle was arrested and charged with possession with intent to distribute.

219.   Christopher Hinkle was a victim of the opioid epidemic.

220.   He had a long history and struggle with substance abuse.

221.     Christopher Hinkle was a non-violent person, whose minor criminal history surrounded his drug addiction.

222.     Moreover, as demonstrated by the Behavioral Health Social Worker's Report from April 8, 2021, Christopher Hinkle was "…cleared for segregation and paperwork was provided to CO [Correctional Officer] in receiving room."

223.     However, Christopher Hinkle was not placed in segregation as per the directive of Amy Fisher, LSW. Instead, Christopher Hinkle was placed in a jail cell with Inmate Wright.

224.     ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████

225.     ███████████████████████████████████████████████████████
███████████████████████████████████ was an act of complete disregard for the well-being, welfare, and safety of others. Defendants knew Inmate Wright would attack his cellmate, Christopher Hinkle. (The known threat of violence was exacerbated by Defendants failure to provide medications to ease Christopher Hinkle's symptoms of withdraw, which would further agitate Inmate Wright.)

226.     Defendants further knew that with Unit B1, Pod 3 being unstaffed or understaffed, they could not intervene, protect, and/or come to Christopher Hinkle's aid once he was attacked by Inmate Wright.

227.     ███████████████████████████████████████████████████████
███████████████████████████████████

228.     ███████████████████████████████████████████████████████
████████████████████████████████████████████████

229. ██████████████████████████████████████████████████

██████████████████████████████████

230. On April 9, 2021 at approximately 2:40PM, Inmate Wright was placed on Unit B1, Pod 3 at CFCF, Cell 14.

231. ██████████████████████████████████████████████

████████████████████████████████████████████████

███████

232. ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

233. ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

234. Earlier in the day on April 12, 2021, Inmate Wright started to snap and yell at Christopher Hinkle who merely inquired to a correctional officer about when they would be able to take a shower since it had been several days that he had went without a shower.

235. Upon information and belief, ████████████████, at all times during Inmate Wright's incarceration, Defendants were aware or should have been aware of Inmate Wright's violent propensity.

236. At the time, Christopher Hinkle and Inmate Wright had been locked down in their cells together for several days.

237.   On April 12, 2021, at approximately 8:19PM, Inmate Wright violently and without provocation beat and struck Christopher Hinkle.

238.   The violence was long-lasting and loud, yet there was no intervention by any guards.

239.   Further, there is a known issue with call buttons at the correctional facility, and it is believed Mr. Hinkle was unable to use the call button because it was not working.

240.   Inmate Wright caused severe injury to Christopher Hinkle's head and neck area, to the point that he was unable to move his upper and lower body.

241.   Christopher Hinkle was transported from Cell 14 by medics and taken to Jefferson Health - Torresdale Hospital.

242.   He sustained extensive blunt impact injuries to his torso, extremities, head and neck, to the extent that he was unrecognizable.

243.   His injuries, included, among other things:

      a.   Left supra-orbital rim laceration, with subgaleal soft tissue hemorrhage and peri-orbital contusion

      b.   Left parietal scalp, laceration, with subgaleal soft tissue Hemorrhage;

      c.   Left ear abrasion;

      d.   Right ear, Helical rim with crusted abrasion and temporal muscle with soft tissue Hemorrhage;

      e.   Left anterolateral Tongue with Soft Tissue Hemorrhage;

      f.   Posterior Neck Soft Tissue Hemorrhage and Fracture Dislocation C4-C5 with soft tissue hemorrhage;

g. Scattered hemorrhagic contusions and subarachnoid hemorrhage, with diffuse subarachnoid hemorrhage and mild parafalcine and left frontoparietal subdural hemorrhage;

h. Fractures of the left zygomatic arch and left maxillary sinus, lateral wall of the left orbit and the inferior orbital rim,

i. Acute Hemorrhage in the Left Maxillary Sinus;

j. Multiple Hemorrhages in the Inferior Frontal Lobes bilaterally;

k. 2nd and 3rd Left Rib Fractures;

l. Contusions and Hemorrhage of Right ribs;

m. Thoracic back injury and hemorrhage;

n. Left shoulder injury and hemorrhage;

o. Left elbow injury and hemorrhage;

p. Left thigh and knee contusions; and

q. Right Foot contusions.

244. On April 25, 2021, Christopher Hinkle passed away, succumbing to the injuries sustained from the attack carried out by Inmate Wright. In his death, he would give life to others as an organ donor.

245. When the responding officers arrived, Inmate Wright was handcuffed ████████████ ████████ .

246. Inmate Wright was subsequently charged with murder stemming from the brutal assault upon Christopher Hinkle on April 12, 2021, with said Criminal Case presently pending in the Philadelphia County – Court of Common Pleas – Criminal Division.

247.   ██████████████████████████████████████████████████

██████████████████████████

248.   At all times relevant hereto, Inmate Wright had a history of violent behavior, being held in confinement as a result of three (3) crimes of violence.

249.   Inmate Wright's violent history, ████████████████████████████ ████████████████████████████████████ it was only a matter of time before he would attack and cause bodily injury to anyone who he would be housed with – all of which Defendants were aware of. This was not theoretical but rather a certain and inevitable result of Defendants actions, or lack thereof.

250.   ██████████████████████████████████████████████████

████████████████████████████████████

251.   ██████████████████████████████████████████████████

██████████████████████

252.   ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

253.   ██████████████████████████████████████████████████

██████████████████

████████████

██████████████████

████████████

████████████

████████████



254. ████████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

████████████████████████████████████

255.    Sergeant David Robinson, when asked about Mr. Hinkle's death, stated, "a lot of things would happen that wouldn't normally happen."[23]

256.    Sergeant Robinson, in discussing the assault on Mr. Hinkle stated, "[A]t what point does the city take accountability to say: What's going on in these jails? Because it's not safe — not safe at all."[24]

---

[23] https://www.cbsnews.com/philadelphia/news/christopher-hinkle-philadelphia-prison-death-rameel-wright/
[24] https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html

257.    On April 27, 2021, Inmate Wright was cited for a disciplinary infraction when he engaged

in an argument with his then cellmate, Patrick Flood. Inmate Wright punched Patrick Flood in the

face while Mr. Flood was sleeping.

258.    Of grave concern is the fact that Inmate Wright, having just left Christopher Hinkle

clinging on for his life, was still being housed with others.

259.    At some point after these attacks, it is believed Inmate Wright was deemed mentally unfit

to stand trial and is an inmate ███████████████████████████████████████.

## CAUSES OF ACTION
## WRONGFUL DEATH

260.    The preceding paragraphs and allegations are incorporated by reference as though fully set

forth herein.

261.    Plaintiff hereby brings Wrongful Death claims pursuant to 42 Pa.C.S. § 8301 (the

Pennsylvania Wrongful Death Statute) on behalf of all those persons entitled by law to recover

damages as a result of the wrongful death of Christopher Hinkle.

262.    The only person legally entitled to recover under the Wrongful Death Statue is Christopher

Hinkle's mother, Administrator Diana Lawhon, who resides in Monroe County, Pennsylvania.

263.    No other action has been brought to recover for Christopher Hinkle's death under the

aforementioned statute.

264.    Plaintiff claims all available damages under the Pennsylvania Wrongful Death Statute for

financial contributions and the loss of future services, support, society, comfort, affection,

guidance, tutelage, and contribution that Plaintiff's decedent, Christopher Hinkle, would have

rendered to the wrongful death beneficiary but for his traumatic, untimely, and unnatural death.

265.    Plaintiff claims damages for payment for all medical bills and/or expenses.

266.    Plaintiff claims damages for payment of funeral and burial expenses.

## SURVIVAL ACTION

267.    Plaintiff also brings a Survival Action under the Pennsylvania Survival Statute, 42 Pa.C.S.

§ 8302, and pursuant to Pa.C.S. § 3373, for all damages recoverable under the Statute, including

but not limited to, loss of income as well as nightmarish and agonizing pain and suffering prior to

death, and for the emotional distress suffered by Christopher Hinkle from the time of first impact

from the assault and/or injury to the time of his death.

### COUNT I – CIVIL RIGHTS – FOURTEENTH AMENDMENT – 42 U.S.C. § 1983
### Plaintiff v. Individual Defendants – Deputy Warden Bowers, Deputy Warden Rose,
### Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional
### Officer John Does 1-10

268.    The preceding paragraphs and allegations are incorporated by reference as though fully set

forth herein.

269.    As set herein, this is a civil rights action brough pursuant to 42 U.S.C. § 1983 that

challenged the unconstitutional actions of Defendants Deputy Warden Bowers, Deputy Warden

Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional

Officer John Does 1-10 that resulted in the assault and murder of Christopher Hinkle.

270.    At all relevant times hereto, Defendants Deputy Warden Bowers, Deputy Warden Rose,

Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John

Does 1-10 were "persons" acting under color of state law.

271.    The Fourteenth Amendment imposes on Defendants Deputy Warden Bowers, Deputy

Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and

Correctional Officer John Does 1-10 the obligation to take reasonable measures to protect pretrial

detainees from violence at the hands of other inmates.

272.    As a pretrial detainee, Christopher Hinkle had a constitutional right to be free from inmate

violence, the exact type of violence that was inflicted upon Christopher Hinkle by Inmate Wright

by virtue of Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10 failures with respect to the obligations they owed to Christopher Hinkle, who was in their care, custody, and control.

273.    As explained above, Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10 failed in their obligation at every turn.

274.    Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10's conduct exposed Christopher Hinkle to a substantial risk of harm.

275.    Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10 knew of and were deliberately indifferent to those known risks.

276.    As a result of Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10's deliberate indifference, Christopher Hinkle was brutally assaulted and subsequently died as a result of the brutal assault.

277.    Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10 were in direct violation of the Fourteenth Amendment, as well as their own policies, when they recklessly, willfully and with deliberate indifference facilitated the move of Inmate Wright, who had a well-documented history of violent tendencies, a history of violence and criminal behavior, ███

████████ into the same cell as Christopher Hinkle, a non-violent inmate, all while knowingly being too understaffed to provide adequate supervision.

278.    While acting under color of state law, Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10 affirmatively created the danger that led to Christopher Hinkle's death by, among other things:

    a.    Failing to maintain appropriate staff in the inmate housing units;

    b.    Failing to place Christopher Hinkle in segregated housing as per the Behavioral Health Social Worker's Report on April 8, 2021, which was provided to the Correctional Officer in CFCF's receiving room;

    c.    ████████████████████████████████████████ ████████████████████████████████████████ ████████████████ ;

    d.    Failing to have adequate correctional officers on Christopher Hinkle's cellblock;

    e.    Allowing Christopher Hinkle's cellblock to have no correctional officers assigned to it;

    f.    Failing to undertake corrective measures, such as contracting out and obtaining additional correctional officers to adequately staff CFCF and other PDP facilities;

    g.    Failing to conduct regular checks of the cells housing inmates for several hours;

    h.    Failing to house Inmate Wright in a single-person cell, isolated from other inmates such as Christopher Hinkle;

    i.    Failing to intervene when Inmate Wright brutally began assaulting Christopher Hinkle;

j. ███████████████████████████ ;

k. ██████████████████████████████████████
   ████████ ;

l.  Failing to transfer Rameel Wright out of Christopher Hinkle's cell prior to the assault;

m. Failing to adequately protect Christopher Hinkle from fatal injuries while in their custody and control; and

n.  Willfully subjecting Christopher Hinkle to repeated physical and psychological torture that ultimately led to his death, as previously described herein.

279. Assuming, *arguendo*, Inmate Wright █████████████████████████████
████████████████ Defendants were grossly, willfully, and intentionally negligent and reckless in failing to take action to segregate Inmate Wright to an individual jail cell predicated ██████████████████████████ .

280. Alternatively, ████████████████████████████████████████
████████████████████████████ was grossly, willfully, and intentionally negligent and reckless and Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10 were aware – ████████████████████████████████ – that Inmate Wright should be segregated and isolated from other inmates and ████████████
██████████████████████ .

281. The dangers knowingly created by Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10, as set forth above, was foreseeable and direct, and through their failure,

willful disregard, and deliberate indifference to Christopher Hinkle's safety, Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10 acted with a degree of culpability that shocks the conscience. Christopher Hinkle was subjected to cruel and unusual punishment.

282.    Defendants Deputy Warden Bowers, Deputy Warden Rose, Warden Giannetta, Warden John Does 1-10, Commissioner Carney, and Correctional Officer John Does 1-10's acts and omissions caused Christopher Hinkle to suffer extreme and severe physical and emotional distress, terror, agony, and ultimately were the direct and proximate cause of his death.

### COUNT II – MUNICIPAL LIABILITY CLAIMS
### Plaintiff v. Defendant City of Philadelphia

283.    The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

284.    Defendant's conduct, as set forth above, evinces a violation of Christopher Hinkle's constitutional rights, including those guaranteed by the Fourteenth Amendments to the United States Constitution.

285.    As stated above, Defendant had customs and practices and maintained policies and/or procedures that they knew resulted in improper placement and/or housing of inmates with violent tendencies and/or a history of violence ███████████████ such as Inmate Wright, resulting in deprivation of other inmates' constitutional rights and resulting in serious injury and/or death to other inmates. Despite this, Defendant failed to amend, revise, and/or replace these customs, practices, policies, and/or procedures, thereby depriving Christopher Hinkle of his constitutional rights.

286.    As stated above, Defendant had customs and practices of failing to maintain an adequate number of correctional staff, ███████████████████████████, lock inmates up in their cells for prolonged periods of time, and disregarding the prison's written policies, among other things.

287.    Defendant knowingly, intentionally, deliberately, and willfully permitted Unit Pods to go unstaffed by correctional officers, in spite of its policies and procedures requiring two correctional officers at any given time.

288.    Defendant knowingly, intentionally, deliberately, and willfully permitted Unit Pods to go understaffed by correctional officers, in spite of its policies and procedures requiring two correctional officers at any given time.

289.    Defendant continued and deliberately failed to maintain an adequate number of correctional staff despite being placed on notice countless times.

290.    Defendant failed to undertake corrective measures, such as contracting out and obtaining additional correctional officers to adequately staff CFCF and other PDP facilities.

291.    Defendant failed to properly train, supervise, hire, and/or monitor, and/or failed to have a proper policy and/or procedure regarding training, hiring, supervising and/or monitoring, correctional officers and supervisors, on the appropriate placement and/or housing of inmates with violent tendencies and/or a history of violence ███████████████████ such as Inmate Wright.

292.    Defendant failed to properly train, supervise, and/or monitor, and/or failed to have a proper policy and/or procedure regarding training, supervising and/or monitoring, correctional officers and supervisors, to identify, prevent, and intervene in assaultive conduct, thereby depriving Christopher Hinkle of his constitutional rights.

293.    Defendant failed to enforce written policies and/or procedures for correctional officers and supervisors with regard to the placement and/or housing of inmates with violent tendencies and/or

a history of violence ████████████████ such as Inmate Wright, thereby depriving Christopher Hinkle of his constitutional rights.

294.    Defendant failed to properly adhere to its written policies and/or procedures as to placement of inmates when it failed to place Christopher Hinkle in segregated housing as per the recommendation of a social worker which was provided to the Correctional Officer in CFCF's receiving room.

295.    Further, Defendant failed to properly train, supervise, monitor, or have a proper policy and/or procedure in place for the ████████████████████████████ ████████████████████████████████████ ████████████ .

296.    This deliberate failure to uphold and recognize the rights of a pretrial detainee, such as Christopher Hinkle, who had a constitutional right to be free from inmate violence, is the demonstrated in the impermissible/improper placement of Christopher Hinkle in a jail cell when it was explicitly directed he be placed in segregated housing.

297.    Defendant failed to properly train, supervise, monitor, or have a proper policy and/or procedure in place regarding training, supervision, and monitoring of correctional officers and supervisors to ensure proper placement and/or housing of inmates with violent tendencies and/or a history of violence ████████████████ such as Inmate Wright.

298.    The above-referenced actions are outrageous, egregious, and conscience-shocking.

299.    Defendant knew or had reason to know of facts that created a high degree of risk of physical harm to another, and deliberately proceeded to act, or failed to act, in conscious disregard of or indifference to that risk, as evidenced by their customs, practices, polices, and/or procedures that allowed Christopher Hinkle, a non-violent inmate, to be housed with Inmate Wright, who had a

well-documented history of violent tendencies, a history of violence and criminal behavior, ███

███████████████

300.    Defendant's deliberate indifference is demonstrative by its actions of placing Inmate Wright, who had a well-documented history of violent tendencies, a history of violence and criminal behavior, ████████████████, in a jail cell with Christopher Hinkle, a non-violent inmate, or any other inmate for that matter---all in a grossly understaffed, lawless environment where an inmate would not be able to be protected ████████████████████████

████████████████████████████████████████████████████████

███████████████████

301.    As demonstrated by the above-mentioned other similar instances wherein Defendant carried out its practices, policies, and/or procedures of placing inmates who have well-documented histories of violent tendencies, histories of violence and criminal behavior, ██████████████ ██████ in jail cells with other inmates exhibits its long-standing policy/custom of deliberate indifference to the rights, welfare, and safety of those in Defendant's custody, care, and control.

302.    Defendant knew that these egregious customs and practices, policies, and/or procedures had and would continue to result in the brutal deaths of inmates, such as Christopher Hinkle.

303.    The customs, practices, and policies of the City of Philadelphia were a moving force behind the violation of Christopher Hinkle's constitutional rights.

304.    Christopher Hinkle was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, and by the City of Philadelphia through its many failures as address throughout this Amended Complaint.

305.    Policymakers and authoritative figures knew of the failures of the Philadelphia Department of Prisons as discussed herein but failed to take the necessary steps to rectify the failures and adequately protect the constitutional rights of the inmates in their custody.

306.    As a direct and proximate result of Defendant's unreasonable, unjustifiable, and unconstitutional conduct, Christopher Hinkle was caused to suffer the serious injuries and ultimately death as described herein.

## COUNT III – MEDICAL NEGLIGENCE
**Plaintiff v. Defendants, Corizon Health, Inc., Nurse Leone, Nurse Greene, and Medical John Does 1-10**

307.    The preceding paragraphs and allegations are incorporated by reference as though fully set forth herein.

308.    Defendant Corizon Health, Inc. and its medical providers, including Nurse Leone, Nurse Greene, and Medical John Does 1-10, had a duty to comply with generally accepted medical standards of care. Instead, they acted negligently, with willful misconduct and were grossly negligent.

309.    Defendant Corizon Health, Inc. and its medical providers, including Nurse Leone, Nurse Greene, and Medical John Does 1-10, had a duty to comply with generally accepted medical standards of care, ███████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████.

310.    Defendant Corizon Health, Inc. and its medical providers, including Nurse Leone, Nurse Greene, and Medical John Does 1-10, had a duty to comply with generally accepted medical standards of care to ████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████.

311.    Defendant Corizon Health, Inc., directly and by and through its agents, servants, and/or employees, had a duty to ensure ███████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████.

312.    Defendant Corizon Health, Inc., directly and by and through its agents, servants, and/or employees, had a duty to ██████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████.

313.    Defendant Corizon Health, Inc., directly and by and through its agents, servants, and/or employees, violated its duty of care to Christopher Hinkle by failing to ███████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████.

314.    Defendant Corizon Health, Inc., directly and by and through its agents, servants, and/or employees, violated its duty of care to Christopher Hinkle by failing to ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████.

315.   Defendant Corizon Health, Inc. failed to hire, select, retain, and properly supervise competent medical professionals ███████████████████████████████ ███████████████████████████████████████████

316.   Defendant Corizon Health, Inc. failed to hire, select, retain, and properly supervise competent medical professionals to ensure ███████████████████████ ████████████████████████████████████████████ ████████████████████████

317.   Defendant Corizon Health, Inc. failed to ████████████████████ ████████████████████████████████████████████ ████████████████████████████

318.   Defendant Corizon Health, Inc. failed to ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████

319.   Defendant Corizon Health, Inc. failed to establish and/or follow policies, practices, and/or procedures to ensure ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████

320.   Defendant Corizon Health, Inc. failed to ██████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

321.    Defendant Corizon Health, Inc., directly and by and through its agents, servants, and/or employees, violated its duty of care by failing ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

322.    Defendant Corizon Health, Inc.'s violation of its duty of care to Christopher Hinkle was a direct and proximate cause and a substantial factor in bringing about Christopher Hinkle's serious injuries and ultimate death as described herein.

## JURY DEMAND

Plaintiff demands a jury determination of all issues so triable.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff asks the Court to:

a.   Enter judgment in Plaintiff's favor, against all Defendants;

b.   Award Plaintiff compensatory damages (well in excess of $150,000.00) against all Defendants (this includes but is not limited to all damages permitted under Pennsylvania's Survival and Wrongful Death Acts, including decedent's immense pain and suffering and the loss suffered by decedent's mother);

c.   Award exemplary and punitive damages against all Defendants;

d.   Award such interest as the law permits;

e.   Award Plaintiff attorney fees and costs pursuant to 42 U.S.C. § 1988; and

f.   Provide Plaintiff with such other and further relief as the Court deems just and equitable.

TOWN LAW LLC
By: */s/ Ian V. Gallo*
    Co-Counsel for Plaintiff
    Ian V. Gallo, Esq.
    Attorney ID No. 320758
    1650 Market Street
    Suite 3600
    Philadelphia, PA 19103
    917-974-6091
    Fax: 610-813-4944
    igallo@thetownlaw.com

**Respectfully submitted:**
STROKOVSKY LLC
By: */s/ Jordan Strokovsky*
    Co-Counsel for Plaintiff
    Jordan Strokovsky, Esq.
    Attorney ID No. 318811
    1650 Market Street
    Suite 3600
    Philadelphia, PA 19103
    215-317-6545
    Fax: 215-501-5556
    jordan@actionafterinjury.com

Dated : February 12, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Ian V. Gallo, Esquire, hereby certify that on February 11, 2023, I electronically filed the foregoing Plaintiff's Amended Complaint with the Clerk of Court using the *CM/ECF System*, which will be served to all counsel of record via the Court's E-Filing system. To the extent that any party lacks representation, service will be forthcoming.

Respectfully submitted,

**TOWN LAW LLC**

Dated: <u>February 12, 2023</u>          By: <u>*/s/ Ian V. Gallo*</u>
                    Ian V. Gallo, Esq.
                    Attorney ID No. 320758
                    1650 Market Street
                    Suite 3669
                    Philadelphia, PA 19103
                    917-974-6091
                    Fax: 610-813-4944
                    igallo@thetownlaw.com
                    *Co-Counsel for Plaintiff*